318-0215 People of the State of Illinois versus Jason D. Sanders. Gentlemen, before we get started, I noticed there is a motion to add a third. Has anybody not objected to that? It's not, the response is not until tomorrow. Is there any objection to that? No, your honor. All right, so we'll just assume that's filed. Well, is it filed or granted? Granted. Well, I object to it as a member of the court. It's not authority. I'm surprised there's no response. It doesn't qualify as legal authority. So on the record, I would object to granting that. All right. Justice O'Brien, any objection? No. And I have none. So it'll be granted. So, Mr. Ossoff, are you ready to begin? We are the FLEs, your honor. Oh, I'm sorry. You're both appellants on my screen. You'll have to pardon me. Mr. Boyd, forgive me. Good afternoon, your honors. Andrew Boyd from the State Appellate Defender's Office on behalf of the defendant, Jason Sanders. If it pleases the court and counsel, I've raised several issues in this case. The first one is whether there was a rule 431B error and the evidence was closely balanced. The second is whether defense counsel was ineffective or injecting the issue of race into the proceedings and also for failing to request certain jury instructions. And I've also raised two sub issues related to sentencing. And before I start, I would briefly note that the state has conceded that if this court were to grant Jason no other relief, it should, at a minimum, remand the case for a hearing on the merits of the motion to reconsider sentence. Having said that, the first issue I'd like to focus on and the one that I believe is most timely is the question of whether Jason's trial attorney was constitutionally ineffective for injecting the issue of Jason's race into the closing arguments. And we will start, I would like to start, your honors, with the notion, and this ties into the motion to cite a dissimilar authority that I filed, and Justice Holdred, your objection is certainly noted, but there has been an increase in awareness throughout the United States that there is a pervasive problem with racism in the United States criminal justice system. And the Illinois Supreme Court has issued a formal statement recognizing that racism is a problem in the criminal justice system and that's what our and I'd just like to briefly paraphrase from the Supreme Court's statement on that there's no longer any substantial argument as to whether or not racism exists. There's also no longer any substantial argument as to whether racism undermines the fair and equitable administration of justice in the state of Illinois. So, of course, racism exists. Of course, people of color are continually confronted with racial injustices and courts like this one have the opportunity to set things right and I certainly hope that this happens in this case. What defense counsel did in his closing arguments was prejudicial by definition to Jason. The upshot of counsel's comments was that he was personally frightened of Black men, it was rational to be scared of Black men, and Jason was the stereotypical scary Black man. Now, I don't have any reason to believe that the things that counsel said were intentionally malicious, but the comments were offensive and they were improper nonetheless. Now, when we address a... Now, did he not also, the defense counsel, inject race in when he was talking about his client's behavior? He injected race in a number of different contexts, your honors, and I do think one of those had to do with his behavior. The upshot, at least as I saw it, was that Jason was the typical scary Black man and that it would have been rational to be frightened of him. But the short answer to your question, your honors, yes. Well, okay, I guess what I'm several statements made by this defense attorney. Is this a public defender, by the way? Ah, gosh, I don't know, your honor. Okay. All right. Okay. Well, somewhere along the line, I thought there were statements made to try to explain why a plane with a truck was a... Why he did that. Well, I think it's fair to point out that what counsel may have been attempting to do was to partially explain why Jason did what he did. And part of those fears may have been tied in with race. I certainly do think that's something that counsel was trying to get across. And again, I don't think that what counsel was doing here was necessarily malicious. I think it was horribly misguided, but I don't think it was malicious. And I do think, yes, to answer your question, that in part, you may have been trying to explain why Jason made off with the truck. Yes. Okay. Given that to be the case, let's say he's injected race, okay. How does the court as an institution deal with this? Because we've got this statement that's without any evidence by the Supreme Court, but frankly, where in the administration of justice are the problems, et cetera. They never highlight that. So that's why I take issue with this as even approaching legal authority. Okay. Now, but for you and your argument, you've got it in and you've got it rightfully as an issue in your appeal, but isn't it really based on a, if we wanted to do a legal analysis that this was introduced and there was no evidence whatsoever at trial on this issue? Well, I certainly think that's part of the problem. From my point of view, it's not the main thrust of the problem, but I certainly think it's a part of the problem. And what I pointed out was reversible. When you have a defense attorney talking about things that were never presented before the jury, such as race, that was not the way that I framed the issue, your honor. But I certainly understand that the issue wasn't that a legal framing of an issue that we've got a lot of precedent on. Yes, your honor. That, that would be one way to frame this issue. Yes, it would. Because otherwise we've got a situation that we have a white victim or a white perpetrator, a black victim, a black perpetrator. And if they're both in court, there was an observation being made by a jury fact finder of people's respective race, right? Yes. Without it ever being introduced as evidence. I mean, it's a, it's a problem. Mr. Boyd, it's a real problem. But is it not? Where, where are we on the line of analysis that defense attorney can quote, go off the rails and start talking about things that were never put into evidence? Well, certainly if, if your honor wanted to grant relief on that basis, I would certainly have no objection that that wasn't the thrust of the argument that I made. But if, if this court would like to move in that direction and grant Jason relief on that basis, we, we certainly have no objection to that. Okay. Well, that was my question, but now what are you doing with this? I mean, which, what's your framing and what, and succinctly, what are you saying? This is reversible because of the actions of the defense attorney and why it's reversible because it was ineffective assistance to counsel. It was an unreasonable, it was an unreasonable performance by counsel and it was clearly prejudicial to Jason. That's my argument in a nutshell, your honor. Okay. Thank you. All right. Um, if I might, um, I'd like to talk just a little bit about the issue of prejudice here and exactly why this was so prejudicial to Jason, at least in the framework that I've, that I've outlined the ineffective assistance to counsel framework. Um, I will concede that we can't know for sure why the jury did what it did, but the things that counsel said regarding race could very easily have backfired. This was more than a situation in which counsel simply mentioned Jason's race and then asked for the jury to give him a fair chance. Counsel articulated some ugly prejudices about African-American men, namely that they're scary and it's rational to be scared of them. That goes back to my question, Mr. Boyd, is that we have pictures of the defendant, which identify race, which some of those pictures, I think you contend are prejudicial to squad car. Am I correct? Is there something there in squad car? There was, there was some video of his arrest. Yes, your honor. Okay. Okay. And if we accept it's true that there's implicit bias, then do we have to talk about the level of prejudicial prejudice? Um, again, your honor is raising this under a different framework than the one that I had, which is perfectly okay with me. Um, and I'd underline again that, that if, if your honor wants to frame this differently and, and grant Jason relief under a different legal framework, that's perfectly okay with me. And I, I do understand where your honor is coming from. It makes, it makes sense to me that Jason's race per se was, was not an issue in this case until the defense made it an issue. Um, in other words, the issue of Jason's race had nothing to do with the elements of the offense. And so certainly this court, if it wanted to take a different tact, if it wanted to attack this issue under a different legal framework, this court's certainly free to do that. Um, and I, I would certainly have no, no problem or issue or complaint with that as long as you were saying. And I think, you know, early that it would be permissible for the defense attorney to say the race of my client is obvious. I mean something to that effect and ask the jury not to in that, to not take that into consideration at all in their deliberations. You said with that, would you take the same position about that type of statement or argument? Certainly. I, I think a, uh, innocuous statement of the sort that your honor is suggesting would be just fine, um, would not be prejudicial. Um, I guess, I guess my concern here, um, even with what your honor is proposing is that unnecessarily introducing the issue of race can backfire. Um, we, we simply don't know how folks are going to react to this. And as I believe it was the Georgia appellate court that I cited to in my opening brief, the issue of race can be incendiary and it can backfire. And I don't ask for this court to create any sort of bright line rule saying that a defense attorney can never mention the issue of race. That's not what I'm asking this court to do. And I think comments along the lines of the comments that your honor is suggesting would be acceptable, but, but I would underline, um, again, that race and particularly right now, racism is incendiary and even something like that could backfire. So is it, would that be good practice? I don't, I don't know. I'm not sure I would go that route if I were trial counsel. Um, well, I guess what I'm trying to point out, however, we want to structure this, um, raising the issue of race in the way that counsel did here, um, was it was what was improper and was prejudicial to Jason. That, that would be the thing that I would underline regardless of how we're going to frame this issue legally around. Okay. Thank you, Mr. Boyd. Certainly. All right. If there's no other questions about this issue, I will, I will point out, I've also raised an issue that trial counsel was ineffective for failing to ask for some jury instructions. I'm going to go ahead and simply stand on those arguments, the arguments that I made in my brief, and unless there's any questions about that, and I would like to speak before I run out of time, I would like to speak a little bit about the 431B issue. Um, and the, the, the first thing I'd like to, to, to, to talk about here is that this, the state's, uh, I guess what I'll call foundational arguments. Um, the, the, the state has argued that, um, well, because the trial court, and I can see that I'm about to run out of time, so I'll, I'll, I'll be brief here because the trial court recited the 431B principles to the jury, that that is somehow a substitute for the rule 431B questions. And that simply can't be the case. Rule 431B contemplates a question and answer process. And this issue of invited error also doesn't work. The defense in no way, shape, or form acquiesced to the rule 431B error. There was no affirmative acquiescence. And I would simply, um, reiterate some of the things that I said in my brief regarding the issue of closely balanced evidence. Um, both of these stories, um, have some flaws. Um, both of these stories are somewhat confusing and we can point to Mr. Bogucki's, um, evasiveness on cross-examination as, as certainly some problems, um, with his story. And so your honors, um, in closing, unless there's any other questions, um, I'd like to ask for this court to reverse Jason's convictions for the reasons that we've articulated in our briefs. Um, and if the court declines to do that, we ask the court to, at a minimum, accept the state's concession, remand the case for a new hearing on the motion to reconsider sentence. So unless there's any other questions, your honors, thank you very much. Doesn't appear to please the court. Counsel, my name is Mark Austell, and I represent the people of the state of Illinois, the FLE. And I'm going to start with defendant's first issue. He argued in the people agree that trial judge violated rule 431B, the Xer principles, where the judge failed to ask all the jurors whether they understood them. Defendant admittedly, uh, forfeited this issue and he asked for plain error review under the closely balanced evidence prong. The trial judge asked all the jurors and all the alternates whether they accepted and agreed with the Xer principles, but the judge asked only seven of the 12 seated jurors if they understood and accepted those principles. Of course, compliance with 431B is mandatory, so this is clear error. But in Glasper, the Supreme Court held that a 431B violation may be subject to harmless error review. And in Glasper and Thompson, our Supreme Court held that juror bias is not presumed where there is a 431B violation. And Glasper reiterated that juries are presumed to follow the jury instructions given. This court in Ammerman noted that our Supreme Court has expressly moved away from Xer's holding that the failure of rule 431B questions is in voir dire as prejudicial error. SEBI clarified that close of trial jury instructions do not completely remedy a 431B violation. And the SEBI court took issue with the fact that though IPIs 2.03 and 2.04 were given in that case, the trial judge did not pose the properly worded questions to any of the prospective jurors prior to trial. And SEBI did not hold that rule 431B errors are always reversible. The court specifically stated the key point of Glasper and Thompson is that a rule 431B violation does not necessarily result in a biased jury. And importantly, defendant does not argue that the wording error produced a biased jury. SEBI's concern was that prior to trial, the jurors were not instructed. They were required to follow the Xer principles. And without violating SEBI, this court may find the trial judge's error was cured. Prior to voir dire, this trial judge detailed the four Xer principles and gave a clear instruction to the veneer that all the jurors had to follow them. The judge posed properly worded questions to seven jurors in the presence of the remaining jurors. The remaining five jurors accepted and agreed to follow the Xer principles. And the trial judge gave pattern jury instructions 2.03 and 2.04 prior to deliberations. So we believe this error, though it is clearly an error, was cured by all the aspects that are in this case that were not present in SEBI in particular. And important to this case is the rule that invited errors are not subject to plain error. And this court must first determine whether defendant invited the error before considering the plain error argument. In Holohan, this court reiterated that were a party acquiesces in a proceeding in a given matter, he is not positioned to claim his prejudice thereby. Here, defendant not only acquiesced to the trial judge's wording when questioning the veneer about the Xer principles, but the prospective jurors whether they understood and accepted the principles when she questioned each of them. Defendant easily could have asked all the jurors whether they understood and accepted the four principles and cured the judge's omission of the word understand from the questions posed to the five jurors. Defendant did not do so in this case. People like to move on at this point to defendant's second issue, where he argues his counsel was in effect for mentioning defendant's race during closing argument and for not requesting a jury instruction on the intent to permanently deprive. Defendant has not argued the intent to permanently deprive, but I presume that may come up in rebuttal, so I touch on that briefly. But initially, we would note that the jury was instructed to closing arguments should be confined to the evidence or inferences drawn from the evidence. Closing arguments are not evidence, and a jury should disregard any argument that's not based on the evidence. And the jury found defendant not guilty of three counts, including the most serious charge. Therefore, counsel's racial statements did not prejudice defendant or change the outcome of the trial, and defendant cannot prove ineffective assistance. Importantly, in cross-examination, Mr. Bogucki said it did not bother him that a black man was in his truck. Instead, he was bothered by the fact that defendant was moving Bogucki's property around. And this court has stated the matters of trial strategy generally will not support an ineffective assistance claim unless counsel failed to conduct any meaningful adversarial testing. The counsel's decision to argue a certain theory in closing arguments is a classic example of trial strategy, and this court will not second-guess decisions which involve counsel's discretion or strategy. In his reply brief, defendant cited Marshall with support for his claim that defense counsel's comments require a new trial, but Marshall involved a prosecutor whose consistent theme throughout the entire trial was to make inflammatory and derogatory racial remarks about what he termed, quote, the black community, end quote. Here, defense counsel made a 23-page closing argument in which he clearly attempted to create reasonable doubt as to the people's evidence. And defendant has quoted in his main brief every instance of a racially-based comment by counsel in closing. The racial statements counsel made generally had little or no basis in the evidence. Racial prejudice by the police or Mr. Bogucki could not be inferred from the evidence, and the comments were clearly counsel's opinion and demonstrated his own prejudices. The counsel's strategy failed to show, failed, does not show that he was ineffective on this, based on this record. Now the people in this court may find counsel's but this did not make counsel ineffective. And the people acknowledged the case law that defendant cited in his briefs regarding the prohibition on injecting race into proceeding, but defendant has also speculated that as a matter of trial strategy, the counsel may have attempted to show that defendant should receive a fair trial regardless of his race. Notably, in reply... Mr. Officer, what would be a reasonable trial strategy for counsel to inject race into, especially into a case where the defendant is African-American? In this particular case, I'll say I don't believe his strategy was warranted or necessarily effective. It, to me, was, reading this closing argument several times, it was counsel injecting his own personal biases into the case and trying somehow to say defendant ran because he was in a white community and felt he was threatened. There was nothing in the evidence to indicate that. And counsel also talked about if he was in South Chicago, in a Black neighborhood, he would get out of there as soon as possible. That's defense counsel's own personal issues, and he should not have injected him in the trial, but that didn't make him ineffective, generally speaking. We note that the people in rebuttable argument also argued that defense counsel claimed that police charged defendant because they were racist was, as he put it, or she put it rather, wholly inappropriate. So it was raised at trial. Now, rather than counsel portraying defendant as stereotypical, scary black male, as defendant put in his main brief, defense counsel actually showed he has his own personal prejudices and that counsel was uncomfortable and fearful around African Americans. But this, again, does not show counsel was ineffective. Case law says even where a defendant, defense counsel concedes a defendant's guilt during closing argument, courts will not presume prejudice unless the strategy amounted to a complete failure to subject prosecution's case to meaningful adversarial testing. And defendant does not claim trial counsel did not subject people's case to meaningful adversarial testing, and the record clearly shows that counsel did so. Even if counsel's performance was deficient, counsel or defendant cannot show that the strictly prejudice prong because he cannot show the outcome of the trial would have been different had counsel not made these racial comments in closing. As I mentioned earlier, in the brief, defendant raised an intent to permanently deprive instruction should have been a given. Defendant was charged with knowingly possessing a semi-truck, knowing it to have been stolen, and if people acknowledge the Pollard's case, defendant's science requires an instruction on the intent to permanently deprive where the evidence shows defendant stole a vehicle. But in Pollard's, unlike here, the evidence was close on the issue of whether defendant stole a car, and the people made that a key issue. The people cited Washington, which stated it was not required where defendant was not charged with theft. And in his interview, defendant admitted to taking a semi-truck, and he was taking it to Arkansas, and the people argued he stole it. In Albine, the court ruled that even if counsel was deficient for not giving an intent to deprive instruction, defendant did not prove prejudice. There was ample evidence to conclude that the defendant stole the car, therefore there was no ineffective assistance. And importantly, in closing argument, defense counsel argued defendant was not trying to steal the semi, as there would have been a big truck with a logo on it in West Memphis. Counsel argued, to find a theft, you got to try and permanently deprive, and defendant did not permanently deprive as he drove down I-57, doing the speed limit, and defendant was not evasive, did not resist arrest. Counsel argued the jury could only find defendant guilty of trespass to a motor vehicle. Now, the jury was given IPIs 2335 and 2336, which are the elements of possession of a stolen vehicle. The committee comment to IPI 2336, which neither party has discussed in our brief, but I have spoken with counsel about this earlier, that I would discuss those comments. This comment states, when a defendant is charged with possession of a stolen or converted vehicle, and it is alleged or the evidence shows that he participated in the actual taking of the vehicle, it may be necessary to include the phrase, intent to permanently deprive, in the definition and issues instructions. And the 2336 comment cites Illinois Supreme Court Cramer, the case that we cited, Washington, and the Bradley case from the First District, which is held that stolen implies an intent to permanently deprive. The committee comments to IPI 2335, when the defendant is charged with possessing stolen vehicles, give the definitions of stolen property and theft. The comment shows the committee decided that though Bradley does not require theft instruction to comply with Coe's argument, the Second District case, the instruction should include IPIs 13.33G for stolen property and 13.01 for theft. However, the instruction specified for theft in 13.01 regards to theft of property not exceeding $500. An intent to permanently deprive is only one of three options. The second and third options require a knowing mental state. IPI 13.04, regarding the theft of property over $500, also lists the intent to permanently deprive as one of three options that may be given for the third proposition. Neither the trial judge nor either party noted the committee comments to the IPIs 2335 and 2336, but the comments show instruction on the intent to permanently deprive is not mandatory. It is one of three options in both 13.01 and 13.04. At the jury instruction conference, Defense Council requested the criminal trespass to a vehicle instruction, as it is a lesser-included defense and counsel specifically noted it does not include the intent to permanently deprive. Defense Council arguably may have been deficient, failing to request a stolen property and theft instructions, depending on whether the committee comments can be read to require those instructions, but neither of those instructions require the jury to be instructed on the intent to permanently deprive. Had the jury been given the theft instruction, it could have found him guilty of a Class I or Class II felony for stealing the semi. Thus, the failure to give an instruction on the intent to permanently deprive did not change the outcome of the trial, and it was good trial strategy. For these reasons, Defense Council was not ineffective. The people will stand on their brief for all other argument, and we ask this court to affirm defendant's convictions. Does court have any other questions for me? No. Apparently not. Thank you, Mr. Ross. Mr. Boyd, any reply? Yes, Your Honor. Two things. The first thing I'd like to point out, as far as the Rule 431B issue, the states conceded that trial court did not ask the potential jury members the Rule 431B questions. That ought to be the end of the analysis. Rule 431B says what case law is extraordinarily clear on this. There's a clear Rule 431B error here, and that's the end of that part of the story. This court shouldn't engage in any further analysis. As far as the issue of injecting race into the proceedings, whether or not this court adopts the legal framework that Justice Holdredge urges, which I think is a reasonable one to propose, or whether this court analyzes this under the rubric of ineffective assistance to counsel, the comments the counsel made were prejudicial to Jason, and this court should not condone them, and this court ought to grant Mr. Sanders a new trial based on those comments alone. Other than that, Your Honor, unless there's any other questions, I've completed my presentation. I thank this court very much for its time, and I'd urge the court to reverse Jason's convictions. Mr. Boyd? Mr. Boyd? Yes, Your Honor. Okay, before we leave, this is new technology, Zoom technology, and we appreciate your participating in this. The court's, you know, we're struggling with all this, but I don't believe you have co-counsel to your right, do you? I do, in fact, yes. Oh, you do? Yes. Okay, well, that's something we haven't talked about, but I was kind of disturbing, and I'm not sure the other members of the court saw it, but you were turning to the right and doing two thumbs up while Mr. Austell was presenting his argument, and I don't think you would do that in a real courtroom. I would not, Your Honor. I erred in doing that. My apologies to the court and my apologies to Mr. Austell. Okay. I was, in a manner of explanation, Your Honor, I was simply, it was an inside joke with my supervisor having nothing whatsoever to do with the substance of anything that we were talking about, Your Honor. The honest truth is I didn't take into account the fact that I was still on tape. It had nothing to do with Mr. Austell. It had nothing to do with the substance of this case, but I do apologize. That's fine, Mr. Boyd. I prefaced my remarks. This is new technology, and we're all reading about how goofy things happen with Zoom, you know, animals walk behind you and stuff like that. So I just wanted to say that we all got to be careful of that. You're absolutely correct, Your Honor. My apologies again. Okay. Thank you. Any other comments or questions, Justice Eldridge? No. No. All right. Justice O'Brien? No. All right. Well, thank you both for your arguments today. It takes this matter under five minutes to pass through the written disposition within a short time. Thanks again.